IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KAREN LYNN CHASE                                                            PLAINTIFF

v.                              Civil No. 09-5212

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                             DEFENDANT

**MEMORANDUM OPINION**

I.      **Factual and Procedural Background**

Plaintiff, Karen Lynn Chase, appeals from the decision of the Commissioner of the Social

Security Administration ("Commissioner") denying her applications for disability insurance benefits

("DIB") and supplemental security income benefits ("SSI"), pursuant to §§ 216(i) and 223 of Title

II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d), and § 1602 of Title XVI, 42 U.S.C.

§ 1381a, respectively (collectively, "the Act").

Plaintiff protectively filed her DIB application on May 7, 2003, alleging a disability onset

date of May 4, 2002, due to migraines, depression, anxiety, agoraphobia, hearing loss, tinnitus, post-

traumatic stress disorder ("PTSD"), nerve damage, memory loss, neck/shoulder pain, and residuals

associated with a closed head injury.  Tr. 11, 40, 83-85, 99, 145.  Plaintiff filed her SSI application

on June 20, 2003.  Tr. 11, 470-74.  At the time of the alleged onset date, Plaintiff was thirty three

years old with a high school education.  Tr. 105.

Plaintiff's applications were denied at the initial and reconsideration levels.  Tr. 44-45, 51-52,

475-80.  A hearing was held on December 1, 2004, and the ALJ rendered an unfavorable decision

on June 29, 2005.  Tr. 11, 483-98.  Plaintiff filed a Request for Review with the Appeals Council.

Tr. 11.  While the Appeals Council was reviewing the ALJ's decision, Plaintiff filed a subsequent DIB application on July 15, 2005, alleging the same onset date.  Tr. 11, 71-72.  A favorable decision was reached on the second claim.  Tr. 72, 78.  On October 19, 2006, the Appeals Council consolidated and remanded the two cases for further consideration.  Tr. 69-74, 77-80.

At Plaintiff's request, an administrative hearing was held on October 5, 2007.  Tr. 499-531.  Plaintiff was present at this hearing and represented by counsel.  The ALJ rendered an unfavorable decision on April 2, 2008, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. 8-23.  Subsequently, the Appeals Council denied Plaintiff's Request for Review on July 31, 2009, thus making the ALJ's decision the final decision of the Commissioner.  Tr. 4-6.  Plaintiff now seeks judicial review of that decision.

## II.   Medical History

### A.   Robert R. Hull, M.D.

Plaintiff has a history of anxiety and depression.  In October 2001, Robert R. Hull, M.D., prescribed Celexa and Clonazepam to help control Plaintiff's symptoms.  Tr. 336.  Plaintiff reported "feeling better overall" on these medications.  Tr. 335.

On December 13, 2001, Plaintiff complained of right shoulder and neck pain.  Tr. 333-34.  X-rays revealed significant spurring and degenerative changes at C5/6, which Dr. Hull believed to be consistent with cervical radiculopathy with probable shoulder impingement and exacerbation of underlying degenerative disc disease.  Tr. 333-34.  Dr. Hull recommended therapy and observation.  Tr. 334.

### B.   Northwest Medical Center

Plaintiff suffered severe head trauma in a car accident on May 5, 2002.  Tr. 199.  She was

taken by ambulance to Northwest Medical Center, where she arrived awake and oriented, but with no memory of the accident. Tr. 201, 204, 311. She suffered a closed head injury with right frontal epidural hematoma with fractures in the orbital roof and the right lateral orbital wall and a small dural laceration. Tr. 199, 204-05, 219, 311-12, 319. She also had blood in the right external auditory canal and several right elbow lacerations. Tr. 204, 311-12. X-rays of Plaintiff's cervical spine, chest, right elbow and pelvis were unremarkable. Tr. 205, 216-18, 316-18. She underwent a craniotomy consisting of evacuation of the hematoma and repair of the dural laceration, which she tolerated well. Tr. 199, 313-14, 327. Plaintiff was discharged from Northwest Medical Center on May 7, 2002. Tr. 199, 327.

    C.  Kelly R. Danks, M.D.

Plaintiff's staples were removed on May 14, 2002. Tr. 238, 326. At this time, Kelly Danks, M.D., restricted Plaintiff from work and driving for one month, noting that she did have a basilar skull fracture and a right hematotympanum. Tr. 238, 326. At a follow-up appointment on July 26, 2002, Dr. Danks released Plaintiff from her care noting that she had "made an excellent recovery from her epidural hematoma." Tr. 236, 324.

In September 2002, Plaintiff saw Dr. Danks with complaints of headaches, numbness in her arms and legs, and dizzy spells. Tr. 234-35, 323. Dr. Danks ordered a CT scan of Plaintiff's head and an MRI of her cervical spine. Tr. 235, 323. Results of the CT revealed some air in her epidural space on the right and some ischemia in the basal ganglia. Tr. 234, 322. The MRI of Plaintiff's cervical spine was unremarkable. Tr. 234, 322. Plaintiff was prescribed Midrin for her headaches. Tr. 232, 321.

D.  Springdale Ear, Nose, Throat and Hearing Clinic

Following her accident, Plaintiff showed signs of right-sided hearing loss, benign paroxysmal positional vertigo, and tinnitus.  Tr. 224-25.  An audiogram performed on May 17, 2002, revealed moderately severe right sensineural hearing loss.  Tr. 225.  Plaintiff's speech discrimination was 88% in the right ear with excellent hearing in the left.  Tr. 225.  A follow-up audiogram performed on July 16, 2002, showed a 15 dB improvement in speech reception threshold.  Tr. 224.

E.  Ozark Guidance Center

Plaintiff began counseling at Ozark Guidance Center in September 2002.  She reported experiencing "real bad panic attacks" and was afraid to leave the house.  Tr. 245, 346.  She also reported migraines, short term memory loss, and depression.  Tr. 343-46.  She had been taking Lexapro for four months.  Tr. 245, 346.

On January 2, 2003, she was diagnosed with PTSD and panic disorder NOS (exacerbated by caffeine consumption) and given a Global Assessment of Functioning ("GAF") score of 60.  Tr. 248, 349.  As of February 2003, Plaintiff had made limited progress and was still afraid to drive and leave the house.  Tr. 340-41.  On April 21, 2003, James Boydstun, M.D., estimated Plaintiff's GAF score at 45-50.  Tr. 243.  Plaintiff lost contact in September 2003.  Tr. 339.

F.  Cygnet Schroeder, D.O.

On June 24, 2003, Plaintiff underwent a physical examination by Cygnet Shroeder, D.O.  Tr. 249-50.  At this time, Plaintiff was taking Celexa and Clonazepam for her depression and anxiety, and Midrin for migraines.  Tr. 249.  Dr. Shroeder noted that Plaintiff developed a nervous facial twitch after being in the room for several minutes.  Tr. 250.  Upon examination, Plaintiff was alert, oriented, and able to follow one-step instructions.  Tr. 250.  Her cervical range of motion was

-4-

functional, sit-to-stand was normal, and she showed no gross focal motor deficits in either the upper or lower extremities.  Tr. 250.  Plaintiff demonstrated decreased balance and an equivocal Romberg sign and had some difficulty standing on each leg independently.  Tr. 250.  She was able to tandem walk slowly.  Tr. 250.  Deep tendon reflexes were intact and no marked spacial deficits were noted. Tr. 250.  Dr. Shroeder opined that Plaintiff "may have post traumatic stress secondary to her motor vehicle accident."  Tr. 250.  She cautioned that Plaintiff's cognition might be impaired on higher functional levels.  Tr. 250.  She also noted that although Plaintiff was able to sit and stand and her fine motor skills were intact, her activities would be limited by fatigue.  Tr. 250.

     G.  <u>Gene Chambers, Ph.D.</u>

     On August 12, 2003, Plaintiff saw Gene Chambers, Ph.D., a neuropsychologist, for a mental evaluation.  Tr. 258-63.  Plaintiff presented with complaints of increasing panic attacks, depression and headaches following her motor vehicle accident in 2002.  Tr. 258.  She reported experiencing an average of five to six panic attacks and two to three headaches per week.  Tr. 258.  She also reported difficulties dealing with the public.  Tr. 259.  After her accident, Plaintiff attempted to go back to her job at EZ Mart, but was unable to remember her job duties or count change accurately. Tr. 259.  She last worked in November 2005.  Tr. 260.

     Dr. Chambers noted that Plaintiff was tense and fidgety through the interview.  Tr. 260.  Her mood was dysthymic and affect constricted.  Tr. 260.  On the Wechsler Adult Intelligence Scale ("WAIS-III"), Plaintiff received a verbal score of 88, a performance score of 107, and a full-scale score of 96, placing her within the average range of intelligence.  Tr. 261.  Despite her average scores, however, Dr. Chambers noted some cognitive defects, including difficulties with processing speed.  Tr. 263.  Based on his evaluation, Dr. Chambers diagnosed Plaintiff with cognitive disorder

NOS, panic disorder without agoraphobia, and PTSD. Tr. 262. He also noted borderline personality traits in Axis II. Tr. 262. Dr. Chambers estimated Plaintiff's GAF score at 50. Tr. 262. He commented that Plaintiff "is quite depressed, at present, although depression is common in post-traumatic stress disorder and it is also very common with post-concussive disorder." Tr. 263.

In a Medical Assessment of Ability To Do Work-Related Activities (Mental) dated August 13, 2003, Dr. Chambers determined that Plaintiff had a poor ability[1] to relate to co-workers, deal with the public, deal with work stresses, function independently, and maintain attention and concentration. Tr. 301. He also found that Plaintiff had a poor ability to understand, remember, and carry out complex job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. Tr. 302. Dr. Chambers explained his findings by stating that Plaintiff's cognitive deficit and panic disorder had worsened to the point that she wanted to "run and hide" from the public. Tr. 301.

H. Linda Green, M.D.

In a Physical Residual Functional Capacity ("RFC") Assessment dated October 28, 2003, Linda Green, M.D., found that Plaintiff had no exertional limitations. Tr. 265-72. She further found that Plaintiff could frequently stoop, kneel, crouch, and crawl and occasionally balance and climb ramps/stairs, but never climb ladders/ropes/scaffolds. Tr. 267. Dr. Green found no manipulative, visual or communicative limitations, but noted that Plaintiff must avoid all exposure to hazards (e.g., machinery, heights, etc.). Tr. 268-69. She found no further limitations.

I. Sheldon McWilliams, Jr., Ph.D.

On December 3, 2003, Plaintiff underwent a mental status evaluation with Sheldon

---

[1] "Poor/None" is defined as "no useful ability to function in this area." Tr. 301.

McWilliams, Jr., Ph.D.  Tr. 273-77.  Plaintiff reported a history of worsening panic attacks since her

accident in 2002.  Tr. 273.  When asked about her childhood, Plaintiff reported being sexually

abused by her adoptive father.  Tr. 274.  She admitted to prior drug abuse, but had since stopped

completely.  Tr. 274.  She reportedly smoked one pack of cigarettes per day.  Tr. 274.

Plaintiff admitted having suicidal thoughts of taking pills and cutting her wrists, but did not

act on them for "fear of going to hell."  Tr. 274-75.  She reported suspicious and paranoid thoughts

as well as auditory hallucinations.  Tr. 274.  She denied any homicidal ideation.  Tr. 275.

Throughout the examination, Plaintiff was anxious yet cooperative.  Tr. 274.  She was

oriented to time, place, and person.  Tr. 285.  Her mental activity was spontaneous, logical and well-

organized.  Tr. 274.  Her mood was dysphoric and her affect anxious.  Tr. 274.  Her concentration,

persistence, and pace were adequate.  Tr. 277.  Dr. McWilliams found no evidence of emotional

lability, mental confusion, deficits of judgment, or disorientation.  Tr. 276.  He concluded that

Plaintiff suffered from PTSD, panic disorder with agoraphobia, and cognitive disorder NOS in Axis

I and possible borderline personality disorder in Axis II.  Tr. 276.  He estimated Plaintiff's current

GAF score at 45.  Tr. 276.  He opined that Plaintiff was not expected to improve significantly within

the next twelve months.  Tr. 276.

J.  Brad Williams, Ph.D.

In a Mental RFC Assessment dated August 29, 2003, Brad Williams, Ph.D., reviewed

Plaintiff's medical records and found moderate limitations in her ability to understand, remember,

and carry out detailed instructions, maintain attention and concentration for extended periods,

complete a normal workday and workweek without interruptions from psychologically based

symptoms and perform at a consistent pace without an unreasonable number and length of rest

periods, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others. Tr. 278-79. Additionally, Dr. Williams considered Listings 12.02 (Organic Mental Disorders), 12.06 (Anxiety-Related Disorders), and 12.08 (Personality Disorders), but determined that Plaintiff's impairments did not meet or equal a Listing, as she had only mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Tr. 282-95.

K.  Kay Morgan, M.D.

Dr. Morgan was Plaintiff's primary care physician from August 2004 through April 2007. She prescribed Celexa, Klonopin (Clonazepam), and Trazodone to treat Plaintiff's anxiety and depression. Tr. 298, 358. Plaintiff reported doing well on these medications, but experienced occasional relapses prompting a change in dosage. Tr. 298, 450. On September 8, 2005, Dr. Morgan gave Plaintiff samples of Celebrex after a right shoulder injury. Tr. 464. On April 12, 2007, she gave Plaintiff a prescription for Vicodin after she fell and injured her right hip and knee. Tr. 449.

L.  University of Arkansas

Plaintiff underwent counseling at the University of Arkansas' Counseling and Psychological Services Center from August 2004 through March 2005. She reported social fears, panic attacks, trouble riding in cars and going to public places, and fear of negative evaluation. Tr. 300. She was initially diagnosed with social phobia and given a GAF score of 50. Kevin Connolly, Plaintiff's counselor, noted overall improvement as Plaintiff was eventually able to drive again, seek employment, and was reporting far fewer panic attacks. Tr. 300. By the end of treatment, Plaintiff was given an estimated GAF of 80 and no longer qualified for the diagnosis of social phobia. Tr.

407.

M.  Scott McCarty, Ph.D.

On January 11, 2005, Plaintiff went to Scott McCarty, Ph.D., for a consultative evaluation. Tr. 304-07.  Plaintiff exhibited excellent effort and motivation in completing tasks, although her written pace was slower due to visibly trembling hands.  Tr. 304.  At the time, Plaintiff's medications consisted of Celexa, Clonazepam, Trazodone, and Rhinocourt.  Tr. 304.  She had no trouble communicating and denied having problems with activities of daily living.  Tr. 306.  She did, however, remain socially withdrawn due to anxiety.  Tr. 306.  Dr. McCarty noted good concentration and excellent persistence, but slow and careful pace.  Tr. 306.  He observed no physical limitations. Tr. 306.

On the WAIS-III, Plaintiff received a verbal score of 96, a performance score of 102, and a full-scale score of 99, which is within the average range of intelligence.  Tr. 305.  On the Wide Range Achievement Test ("WRAT3"), Plaintiff functioned on a post high school reading level, high school spelling level, and seventh grade arithmetic level.  Tr. 305.  Results of the Multiphasic Personality Inventory, Second edition ("MMPI-2"), revealed a highly invalid profile suggestive of possible deception or malingering.  Tr. 305.  Plaintiff scored within the severe range on the Beck Anxiety and Depression Inventories, but Dr. McCarty believed these scores to be highly suspicious given the invalid MMPI-2 profile.  Tr. 306.  Dr. McCarty diagnosed Plaintiff with social phobia, polysubstance dependence (in sustained full remission), R/O malingering.  Tr. 307.  In Axis II, he noted some histrionic features.  Tr. 307.  He estimated Plaintiff's current GAF at 50-51 and gave a good prognosis provided that Plaintiff remained compliant with her medication and counseling.  Tr. 307.

In a Medical Assessment of Ability to Do Work-Related Activities (Mental) dated January 25, 2005, Dr. McCarty found that Plaintiff possessed a good[2] ability to make occupational, performance, and personal-social adjustments.  Tr. 308-09.

### N.  St. Mary's Hospital

On January 19, 2005, Plaintiff went to the emergency room at St. Mary's Hospital with complaints of right shoulder pain.  Tr. 354.  An x-ray of Plaintiff's right shoulder yielded unremarkable results.  Tr. 355.  She was given a sling, a prescription for Vicodin, and instruction on mobility exercises.  Tr. 357, 362.

### O.  Jeanne Curtis, Psy.D.

On September 13, 2005, Plaintiff was evaluated by Jeanne Curtis, Psy. D.  Tr. 369-73.  At this time, Plaintiff was taking Celexa and Trazodone daily and Celebrex and Klonopin as needed. Tr. 369.  She related the history of her motor vehicle accident and reported problems with anxiety, depression, and memory loss.  Tr. 369-70.  She stated that she heard voices for four to five months following her accident and still experienced nightmares. Tr. 370.

Upon evaluation, Plaintiff was oriented to time, person, and place.  Tr. 371. Her thoughts were spontaneous and well-organized and she had no difficulty with concentration, persistence, or pace.  Tr. 370-71.  Her behavior was pleasant, slightly anxious and tearful.  Tr. 370.  She was assessed with PTSD, major depressive disorder, recurrent, severe, without psychotic features, panic disorder with agoraphobia, cocaine dependence, sustained full remission, and amphetamine dependence, sustained full remission.  Tr. 372.  Her estimated GAF score was 35.  Tr. 372.  Dr. Curtis opined that Plaintiff's prognosis was guarded, with appropriate intervention.  Tr. 372.

---

[2] "Good" is defined as "limited but satisfactory."  Tr. 308.

P.  Jerry Henderson

On September 28, 2005, Jerry Henderson, a DDS consultant, completed a disabling Mental RFC Assessment, indicating that Plaintiff was markedly limited in her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. 374-76.  Henderson found moderate limitations in Plaintiff's ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, make simple work-related decisions, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others.  Tr. 374-75.

Q.  Ozark Guidance Center

In November 2006, Plaintiff resumed counseling at Ozark Guidance.  She was diagnosed with depression, anxiety, agoraphobia, and possible mood or personality disorder and given an GAF score of 55.  Tr. 439.  Debra Bauer, Plaintiff's clinician, reported that Plaintiff was responding well to clinical intervention and was doing better overall.  Tr. 425-37.

R.  Mary Sonntag, Psy. D.

On May 25, 2007, Mary Sonntag, Psy. D., evaluated Plaintiff.  Tr. 396-401.  Plaintiff related

her history of panic attacks and difficulty being in public.  Tr. 396.  She was cooperative, but her general attitude was influenced by her anxiousness.  Tr. 398.  Thought processes and content were within normal limits.  Tr. 398.  She admitted having suicidal thoughts one month earlier, but denied any violent ideas.  Tr. 398.  When asked about perceptual abnormalities, she stated that she heard voices two weeks earlier, but could not identify what they said.  Tr. 398.

On the WAIS-III, Plaintiff received a verbal IQ of 98, a performance IQ of 95, and a full-scale IQ of 97, with suspected malingering on the Picture Completion subtest.  Tr. 398-400.  Additionally, Plaintiff's MMPI-2 scores were consistent with a "fake bad" profile.  Tr. 399.  On the Beck Inventories, Plaintiff scored within the severe range of anxiety and depression.  Tr. 399.  Dr. Sonntag concluded that Plaintiff suffered from panic disorder with agoraphobia, undifferentiated somatoform disorder, and polysubstance dependence in full sustained remission.  Tr. 400.  In Axis II, Dr. Sonntag noted histrionic personality features.  Tr. 400.  She assigned Plaintiff a current GAF score of 50.  Tr. 400.  Dr. Sonntag noted that Plaintiff had some credibility issues, as evidenced by the invalid score on the MMPI-2, the many timed failures on the Picture Completion subtest of the WAIS-III, and her vague answers concerning her auditory hallucinations.  Tr. 400.

In an accompanying Medical Source Statement, Dr. Sonntag found that Plaintiff was moderately impaired in her ability to carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with co-workers, supervisors, and the public, and respond appropriately to usual work situations and to changes in a routine work setting.  Tr. 402-03.  She found no other restrictions, but noted that Plaintiff would have difficulty driving due to anxiety associated with her prior accident.  Tr. 402-03.

III.   **Administrative Decision**

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since May, 4, 2002, the alleged onset date.  Tr. 14.  At step two, he determined that Plaintiff suffered from PTSD, panic disorder with agoraphobia, anxiety-related disorder, cognitive disorder, and arthritis and bursitis of the right shoulder, all of which were considered severe impairments.  Tr. 14.  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal a listed impairment.  Tr. 14.  At step four, he found that Plaintiff retained the RFC to occasionally lift/carry twenty pounds and frequently ten pounds, frequently stoop, kneel, crouch, and crawl, and occasionally balance, but never climb ropes, ladders, or scaffolds.  Tr. 14.  He also found that Plaintiff must avoid hazards, including unprotected heights and moving machinery.  Tr. 14.

Mentally, the ALJ determined that Plaintiff had no limitations in understanding and remembering complex instructions, but was moderately limited in carrying out complex instructions and in making judgments on complex work-related decisions.  Tr. 14.  Additionally, he found that Plaintiff was moderately limited in her ability to interact appropriately with the public, supervisors, and co-workers and respond appropriately to usual work situations and routine work changes.  Tr. 14.  Moderately limited was defined as "more than a slight limitation but the person still performs in a satisfactory manner."  Tr. 14.  At step five, the ALJ relied on vocational expert testimony and determined that Plaintiff could perform the requirements of representative occupations such as production worker, sewing machine operator, and cashier.  Tr. 22-23.  Thus, the ALJ concluded that Plaintiff was not under a disability at any point from May 4, 2002, through April 2, 2008.  Tr. 23.

IV.   **Discussion**

On appeal, Plaintiff contends that the ALJ erred by: (1) failing to consider the combined

effects of her impairments; (2) failing to give appropriate weight to her subjective complaints; and (3) improperly determining her RFC.  *See* Pl.'s Br. 17-21, ECF No. 7.  For the reasons stated below, we agree with Plaintiff and remand this case for further consideration.

      A.  <u>RFC Assessment</u>

At the fourth step of the evaluation, a disability claimant has the burden of establishing his RFC.  *Eichelberger*, 390 F.3d at 591; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  A claimant's RFC is the most he can do despite his limitations.  20 C.F.R. § 404.1545(a)(1).  The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Masterson*, 363 F.3d at 737.  The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question."  *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be some medical evidence to support the ALJ's determination.  *Eichelberger*, 390 F.3d at 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir 2000).

In light of Plaintiff's well-documented history of panic disorder with agoraphobia, we seriously question her ability to interact appropriately with supervisors, co-workers, and the public and adhere to a full-time work schedule without excessive absenteeism.  "Unlike many physical impairments, it is extremely difficult to predict the course of mental illness.  Symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse."  *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996) (citing *Poulin v. Bowen*, 817 F.2d 865, 875 (D.C.Cir. 1987)).

The medical opinions in this case are widely varied.  Dr. Chambers and Dr. Curtis completed

the most disabling evaluations.  On August 12, 2003, Dr. Chambers found that Plaintiff had no useful ability to function in nine work-related categories.  Tr. 301-02.  He estimated Plaintiff's GAF score at 50.  Tr. 262.  On September 13, 2005, Dr. Curtis estimated Plaintiff's GAF score at 35, which is indicative of some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 34 (4th ed., 2000).  She found that Plaintiff's prognosis was guarded.  Tr. 372.  Dr. McWilliams evaluated Plaintiff on December 2, 2003.  Tr. 273-77.  He estimated Plaintiff's GAF at 45 and opined that she was not expected to improve significantly within the next twelve months.  Tr. 276.

By contrast, Dr. McCarty and Dr. Sonntag found only moderate limitations in Plaintiff's work ability despite assigning her GAF scores in line with Drs. Chambers, Curtis, and McWilliams.  On January 11, 2005, Dr. McCarty estimated Plaintiff's GAF score at 50-51, which falls between the moderate and severe levels of functioning.  Tr. 307.  In a medical assessment of Plaintiff's work-related abilities, Dr. McCarty found that Plaintiff had a good ability to make work-related adjustments in thirteen out of fifteen categories and an unlimited ability in the remaining categories.  Tr. 308-09.  On May 25, 2007, Dr. Sonntag gave Plaintiff a GAF score of 50, indicating serious limitations.  Tr. 400.  However, she determined that Plaintiff had only moderate limitations in her ability to carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting.  Tr. 402-03.  She found no other limitations.  Tr. 402-03.

In making his mental RFC determination, the ALJ relied heavily on the opinions of Dr. McCarty and Dr. Sonntag while rejecting the more restrictive opinions of Dr. Chambers and Dr. Curtis. Tr. 21. In doing so, he explained that Dr. Chambers assessment was entirely too restrictive while Dr. Curtis' was internally inconsistent. Tr. 21. However, given the low GAF scores assigned to Plaintiff by Dr. McCarty and Dr. Sonntag, we question whether their assessments were not also internally inconsistent.

Additionally, Dr. McCarty and Dr. Sonntag were the only physicians who questioned Plaintiff's credibility in their assessments. Tr. 305-07, 396-401. Interestingly, they also noted that Plaintiff displayed histrionic features in Axis II, which could account for any possible malingering or exaggeration of symptoms. Tr. 307, 400. *See Wheat v. Heckler*, 763 F.2d 1025, 1030 (8th Cir. 1985) (claimant's tendency to exaggerate his symptoms was consistent with his diagnosis of histrionic personality disorder, rather than a deliberate attempt to malinger). Given the ALJ's lack of explanation, we cannot help but conclude that he adopted the opinions of Dr. McCarty and Dr. Sonntag merely because they were less restrictive and not because they were more consistent with the objective evidence of record. For these reasons, we disagree with the ALJ's RFC assessment.

B. Subjective Complaints

In discounting Plaintiff's subjective complaints, the ALJ found that Plaintiff's medication and therapy have been successful in controlling and improving her symptoms. Tr. 19. He also determined that Plaintiff's "allegedly disabling panic attacks were present at approximately the same level of severity prior to the alleged onset date and that the claimant reportedly has had panic attacks as far back as in high school and throughout her adult life." Tr. 19. Thus, since Plaintiff's anxiety did not keep her from working in the past, it should not prevent future work. Tr. 19. We disagree

-16-

with this analysis.

First, the medical evidence of record illustrates that despite consistent treatment and medication (and occasional bouts of improvement), Plaintiff continues to experience serious limitations resulting from her PTSD and anxiety disorder.  Plaintiff's GAF score was consistently estimated within the 45-50 range,[3] which denotes serious symptoms or any serious impairment in social, occupational, or school functioning.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 34.  A GAF score of 50 or below has been held to preclude all work activity.  *See Pate-Fires v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009); *Brueggemann v. Barnhart,* 348 F.3d 689, 695 (8th Cir. 2003) (VE testified that an individual with a GAF score of 50 could not work).  Moreover, Plaintiff's symptoms have not resolved despite compliance with treatment and medication.  Plaintiff's physicians consistently noted nervous behavior in the form of facial twitching, visibly trembling hands, wringing and twisting of her fingers, and shaky legs.  Tr. 250, 260, 273-74, 304, 340.  Additionally, Plaintiff continues to avoid public settings and driving.  Tr. 507-10.

We also disagree with the ALJ's conclusion that because Plaintiff has a history of anxiety and was employed prior to the accident, it necessarily follows that she is capable of work at present.  Tr. 19.  Although Plaintiff has experienced panic attacks as far back as high school, there is no evidence that she experienced them to the same degree and level of severity as after her accident.  Tr. 332, 335-37.  Furthermore, Plaintiff has the additional diagnoses of PSTD, agoraphobia, and

---

[3] Plaintiff's estimated GAF scores are as follows: January 2, 2003- 60; April 21, 2003- 45-50; August 12, 2003- 50; December 3, 2003- 45; August 4, 2004- 50; January 11, 2005- 5 there is no evidence that Plaintiff experienced agoraphobia symptoms and avoidance behavior prior to her accident.  Tr. 332, 335-37.  0-51; March 31, 2005- 80; September 13, 2005- 35; November 28, 2006- 55; May 25, 2007- 50.  Tr. 243, 248, 262, 276, 300, 307, 349, 372, 400, 406, 439.

cognitive disorder, which must be considered in conjunction with her panic disorder.  Tr. 14; *See* 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945.  PTSD often runs concurrently with other mental disorders, including panic disorder and agoraphobia.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 465.  Finally, despite two post-accident work attempts, Plaintiff has been unable to maintain part-time employment due to frequent absenteeism and trouble dealing with the public and co-workers.  Tr. 519.  For these reasons, the ALJ's conclusions are not supported by substantial evidence.

## V.   <u>Conclusion</u>

Accordingly, the ALJ's decision denying benefits to Plaintiff is not supported by substantial evidence and should be reversed.  This matter should be remanded to the Commissioner for reconsideration of Plaintiff's RFC based on all relevant evidence, including medical records, opinions of treating medical personnel, and Plaintiff's description of her own limitations.  On remand, the ALJ should direct interrogatories to both treating and consultative physicians to clarify the medical basis for their opinions.

ENTERED this 27th day of October 2010.

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE